IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HENRY SHARP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-1209-RGA-CJB |
| | ) | |
| VERIZON DELAWARE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Henry Sharp ("Plaintiff") filed this employment discrimination action against

defendant Verizon Delaware Inc. ("Verizon" or "Defendant"),[1] alleging employment

discrimination based on race and gender and retaliatory termination, in violation of Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and 42

U.S.C. § 1981 ("Section 1981"). Presently pending before the Court is Defendant's Motion for

Summary Judgment ("Motion"). (D.I. 39) For the reasons set forth below, the Court

recommends that the Motion be GRANTED.

---

[1]  Defendant asserts that Plaintiff has erroneously named the Defendant as "Verizon Delaware Inc.," a name it was formerly known by, instead of its now proper name, "Verizon Delaware LLC." (D.I. 40 at 1; *see also* D.I. 10 at 1; D.I. 17 at 1) As it is clear that Plaintiff intended to sue "Verizon Delaware LLC," and Defendant does not allege that Plaintiff served some other entity, the Court *sua sponte* will amend the caption to correctly identify the Defendant. *See Stafford v. Vaughn*, Civil Action No. 02-3790, 2005 U.S. Dist. LEXIS 12063, at *1 n.1 (E.D. Pa. May 17, 2005) ("The Court *sua sponte* will amend the caption of this case to identify, as do defendants in their submissions, [the misspelled names of two defendants.]"); *Orrs v. Cohen*, Civ. A. No. 86-7218, 1987 WL 14150, at *1 n.2 (E.D. Pa. July 17, 1987) ("Since it is clear [who plaintiff] intended to sue . . ., we will sua sponte amend the caption of this action to correctly name [the] defendant in this action."); *cf. Zameska v. Seguros ING Commercial Am. S.A. de C.V.*, No. Civ.A.04-1895, 2005 WL 615749, at *1-2 (E.D. Pa. Mar. 15, 2005) (granting plaintiff's motion to correct and amend the original caption pursuant to "misnomer rule" where "it would be reasonable to conclude that plaintiff had in mind the proper entity or person, merely made a mistake as to the name, and actually served the entity or person intended") (internal quotation marks and citation omitted).

## I.     BACKGROUND

### A.     Factual Background

#### 1.     Plaintiff's Employment With Defendant

Plaintiff, an African-American male, is a former employee of Defendant, having worked

for Defendant as a service technician from October 1996 through January 27, 2010. (D.I. 1 at ¶¶

11-13, 25; D.I. 10 at ¶¶ 12-13; D.I. 41, ex. A at 214)  As a service technician, Plaintiff was

responsible for performing a variety of duties pertaining to the installation, repair and

maintenance of cable television, modem and telephone service in residential and commercial

customer properties. (D.I. 41, ex. B at ¶ 4)  Plaintiff, when he was not working in the field, was

based out of Defendant's location at 901 Plant Street in Wilmington, Delaware. (*Id*. at ¶ 3)

#### 2.     Plaintiff's Disciplinary History and Work Performance History

At all relevant times, Plaintiff's employment with Defendant was subject to compliance

with a number of Verizon Work Rules and to Verizon's Code of Conduct. (*Id*., ex. A at 229-31;

*id.*, ex. B at ¶¶ 5-6 & ex. 1)  From 2000 through to his termination in January 2010, Plaintiff was

the subject of 21 "Records of Employee Conduct"—instances in which he was cited for

violations of Work Rules or portions of the Code of Conduct. (*Id*., ex. A at 232-62 & exs. 10-17,

20-24, 26-28; *id.*, ex. C at ¶¶ 6-7 & exs. 1-2)  These disciplinary actions (which included

warnings and suspensions totaling 35 days) involved the following types of conduct:  (1)

instances of absenteeism or tardiness, or taking unpaid time off without approval; (2) various

driving-related citations or accidents (often involving a Verizon vehicle); (3) violations of

numerous Work Rules relating to customer contact and/or interactions; (4) warnings regarding

lack of productivity; (5) insubordination; (6) improperly caring for company property; (7) leaving

2

a temporary assignment without stating a reason and failure to notify a supervisor of certain work conduct; and (8) a violation of the Code of Conduct pertaining to discrimination, harassment and workplace violence. (*Id.*) The last-referenced violation (that pertaining to discrimination, harassment and workplace violence) occurred in March 2008. In that incident, Plaintiff was alleged to have physically confronted a fellow service technician while raising his voice and using a homophobic slur towards the technician; Plaintiff also argued with his union representative during the altercation. (*Id.*, ex. A at ex. 16; *id.*, ex. C at ex 2 at VEROOO556-57; *id.*, ex. D at 18) Plaintiff received a 15-day suspension for this conduct. (*Id.*, ex. A at ex. 16)

Plaintiff also received negative performance evaluations for the last many years of his employment. In 2003 and 2004, his overall performance rating was "Does Not Meet Position Requirements" (the lowest of four options provided). (*Id.*, ex. A at exs. 34-35) In 2005 and 2006, he received a rating of "Improvement Needed to Meet Position Requirements" (the second-lowest of the four options). (*Id.*, ex. A at exs. 32-33) In 2007 and 2008, he again received a rating of "Does Not Meet Position Requirements." (*Id.*, ex. A at exs. 30-31) In 2009, his rating was again "Improvement Needed to Meet Position Requirements." (*Id.*, ex. A at ex. 29) On November 17, 2009, a Record of Employee Contacts indicates that Verizon discussed with Plaintiff that he had "been identified as having one of the 10 worst repeater rates for your job title in DE North." (*Id.*, ex. A at ex. 10)

### 3. Events Leading to Termination of Plaintiff's Employment

On January 11, 2010, Plaintiff was working an 11:00 a.m. to 7:00 p.m. shift, and was dispatched at 12:30 p.m. to provide service to a customer on A Street in Wilmington, Delaware; the customer was having a problem with dial tone delivery. (*Id.*, ex. A at 112 & ex. 1; *id.*, ex. D

3

at 32, 47) Plaintiff was not able to fix the problem during his visit and, pursuant to Verizon's Work Rules, was required to "immediately inform [his] supervisor" or "another management person" about this job "roadblock." (*Id.*, ex. B at ex. 1 at 6; *id.*, ex. D at 32) Instead, near the end of his shift, Plaintiff called Verizon's Dispatch Resource Center ("DRC") to "get clarification on what to do with this customer because the customer wanted his service on that evening." (*Id.*, ex. D at 32) DRC personnel are not management employees, and though they have the ability to remove a service job from a technician's work list, they can do so only with management approval. (*Id.*, ex. B at ¶¶ 7-11)

When Plaintiff called the DRC, he spoke with Angie Cersari, a maintenance administrator ("MA"). (*Id.*, ex. A at ex. 1 at 1; *id.*, ex. D at 32) Ms. Cersari told Plaintiff that she could not remove the job from his work list without management approval; according to Plaintiff, her tone was "a little hostile" and at one point, she said to Plaintiff "you people don't understand anything[,]" and asked "what are you[,] stupid[?]" (*Id.*, ex. A at 116-123 (internal quotation marks omitted)) Plaintiff next called an on-call supervisor, Eric Pulliam, who advised Plaintiff to close the job out and talk to Plaintiff's immediate supervisor in the morning regarding the customer's problem. (*Id.*, ex. A at ex. 1 at 2; *id.*, ex. D at 33) Plaintiff later asserted that due to problems he was having with his computer, he was unable to immediately close out the job electronically. (*Id.*, ex. D at 33-34)

Next, Plaintiff personally visited the DRC and spoke directly with Ms. Cersari. (*Id.*, ex. A at ex. 1 at 3) Before a supervisor could intervene, the conversation turned negative. According to Plaintiff, Ms. Cersari repeatedly cut him off and accused him of confronting her about her failure to remove the job from his work list. (*Id.*, ex. A at 128-31 & ex. 1 at 3-4; *id.*,

4

ex. D at 34-35, 59-60) Ms. Cersari said that during the conversation, she was "short" with

Plaintiff and again told him that only a supervisor could give approval to remove the job from

Plaintiff's list. (*Id.*, ex. D at 59-60)

After this confrontation at the DRC with Ms. Cersari, Ms. Cersari's supervisor, Christina

Stango, informed Plaintiff that he should contact a supervisor if he disagreed with a DRC

decision (Ms. Stango also told Plaintiff that it was "unprofessional and unreasonable" for him to

have entered the DRC to further take up an issue with Ms. Cersari). (*Id.*, ex. A at 132 & ex. 1 at

4; *id.*, ex. D at 27, 36) Plaintiff then went to Verizon's service garage and used a laptop

computer there to close out the A Street job on his own. (*Id.*, ex. A at 134 & ex. 1 at 5; *id.*, ex. D

at 37)

Plaintiff had one final service job that evening on Lombard Street in Wilmington. (*Id.*,

ex. A at 191 & ex. 1 at 5) According to Verizon's Work Rules, Plaintiff was required to "call

ahead on every job" and "visit the customer's location" even if he was "unable to reach the

customer" when calling beforehand. (*Id.*, ex. B at ex. 1 at 5) Plaintiff drove to the job location

and was there for eight minutes (from 6:07 to 6:15 p.m.), but did not call ahead to make contact

with the customer at this job and never attempted to do so that evening. (*Id.*, ex. A at 136-41)

Instead, GPS records indicate that Plaintiff left the job site at 6:15 p.m., drove to another address

(where he stayed for 13 minutes) and then came back to a Verizon garage (where he stayed from

6:36 p.m. to 7:32 p.m.). (*Id.*, ex. A at 140, 188-89, 191 & ex. 1 at 5-7 & ex. 5)

At 7:03 p.m., while still at the garage (and not at the Lombard Street job), Plaintiff made

a call to Verizon's Global Compliance hotline; during the call, Plaintiff complained that Ms.

Cersari had been recently behaving in a "hostile" and "unprofessional" manner towards him,

5

which had created a "hostile work environment" and negatively affected his morale. (*Id.*, ex. A at 146-50, 182-85, 187 & ex. 2) In that same call, Plaintiff also made identical complaints about another MA, Montgomery Williams, who is African-American, and with whom Plaintiff had a verbal confrontation at the DRC in November 2009. (*Id.*, ex. A at 83-84, 149-50, 182-85 & ex. 2)

At the end of his shift, Plaintiff completed his time sheet. Plaintiff wrote that he was at the Lombard Street location from 6:00 p.m. to 7:30 p.m., and that the job was closed because of "No Access" to the address. (*Id.*, ex. A at 191 & ex. 1 at 5-7; *id.*, ex. D at 10)[2]

On January 12, 2010, Plaintiff participated in a transcribed, investigatory interview with Verizon officials, regarding the events of the prior day. (*Id.*, ex. A at 119) During the interview, *inter alia*, Plaintiff discussed his visit to the DRC the day before, and acknowledged the facts referenced above regarding his visit to the Lombard Street address. (*Id.*, ex. A at ex. 1) When asked what he had done during the time he was back at the Verizon garage after leaving the DRC the evening before, Plaintiff did not mention his call to Global Compliance. (*Id.*, ex. A at 143-45 & ex. 1 at 7-8) On the same day, January 12, Ms. Stango sent an e-mail to Jeff Fallon, a Verizon Area Manager, informing him that although Plaintiff had acted in a "calm and polite" manner during his visit to the DRC the evening prior, she and her associates were "reluctant to leave [the building] without a male escort" because they had heard Plaintiff had previously been suspended for violating Verizon's policy regarding workplace violence. (*Id.*, ex. B at ¶ 12 & ex. 2)

On January 27, 2010, Plaintiff was informed of his termination from Verizon. A Verizon

---

[2]     Plaintiff later explained that although he "technically closed out [around] 6:00 pm" he indicated on his time sheet that he had been at the Lombard Street job until 7:30 pm so as to "mak[e] his timesheet match up[.]" (D.I. 41, ex. A at ex. 1 at 5)

Record of Employee Contacts regarding the termination states that it was due to: (1) Plaintiff's "unauthorized" visit to the DRC, which created a "hostile work environment" (an alleged violation of Section 1.2 of the Code of Conduct ("Discrimination and Harassment"));[3] (2) the falsification of Plaintiff's time sheet on January 11 (an alleged violation of Section 3.1.1 of the Code of Conduct ("Create Accurate Records")); (3) Plaintiff's failure to timely inform local management about job roadblocks at the A Street and Lombard Street job (an alleged violation of Work Rule P ("Job Roadblocks")); and (4) Plaintiff's overall employment record. (*Id.*, ex. A at 251-54 & ex. 19) Mr. Fallon, as well as Verizon supervisors Thomas Wilson (Plaintiff's direct supervisor) and John Burgos, participated in the decision to terminate Plaintiff's employment. (*Id.*, ex. E at ¶ 3; *id.*, ex. G at 5-6)

### 4. Additional Facts Regarding Plaintiff's Allegations of Race and Gender Discrimination and Retaliation

In his deposition and in his interrogatory responses, Plaintiff asserted that his claims for racial and gender discrimination were based on the fact that he was treated more harshly than two Caucasian Verizon employees who had been involved in incidents allegedly similar to Plaintiff's actions on January 11, 2010: Jackie Maher (a Caucasian female) and Gregg Andert (a Caucasian male). (*Id.*, ex. A at 12-20, 32, 34; *id.*, ex. I at 8) With regard to Ms. Maher, Plaintiff asserted

---

[3]     As noted above, in November 2009, Plaintiff went to the DRC and had a verbal confrontation with an MA, Montgomery Williams. (D.I. 41, ex. A at 83-84, 149-50) After that visit, Plaintiff was instructed by management that if he encountered a situation where he disagreed with DRC personnel, he could not visit the DRC to speak to or confront MAs, and instead should call a supervisor. (*Id.*, ex. A at 133 & ex. 1 at 4; *id.*, ex. D at 55-56; *id.*, ex. E at ¶¶ 6-8) While the record evidence indicates that Plaintiff and Ms. Cersari had a disagreement by telephone just before Plaintiff's January 11, 2010 visit to the DRC, Plaintiff's testimony is that he went to the DRC not to confront Ms. Cersari, but rather to address technical issues he encountered in closing out the A Street job. (*Id.*, ex. A at 133-34 & ex. 1 at 2-5)

that though she had an "extensive disciplinary history[,]" she was disciplined for only one week

after she made an unauthorized visit to the DRC in which she was verbally abusive, leading to

her having to be physically removed from the DRC. (*Id.*; *see also* D.I. 1 at ¶ 30) With regard to

Mr. Andert, Plaintiff alleged that he was given only a one day suspension after having falsified

time sheets that were inconsistent with GPS records regarding his whereabouts. (D.I. 41, ex. A at

18) Plaintiff stated that his knowledge of these events was based on conversations with Ms.

Maher and Mr. Andert. (*Id.*, ex. A at 22-23, 26-27, 31)

Ms. Maher was in fact suspended for an unauthorized visit to the DRC occurring in June

2009; Ms. Maher had been accused of confronting a management level employee at the DRC.

(*Id.*, ex. B at ¶¶ 19-20) At the time of her suspension, Ms. Maher had been involved in less than

five prior disciplinary incidents, none of which related to a confrontation with or harassment of a

fellow employee. (*Id.*, ex. B at ¶ 21) At the time of his suspension for alleged falsification of a

time sheet, Mr. Andert had only one prior disciplinary issue—a verbal warning for alleged

absenteeism. (*Id.*, ex. B at ¶ 17)

Plaintiff's retaliation claim is largely premised on the allegation that he was fired as a

result of his January 11, 2010 call to Global Compliance. (D.I. 1 at ¶ 20)[4] In his deposition,

Plaintiff acknowledged that he had no facts to show that Mr. Fallon or Mr. Wilson had

knowledge of this January 11 call prior to his termination, and confirmed that he had not told

---

[4]     In response to an interrogatory requesting information regarding all individuals
with whom Plaintiff communicated about alleged discrimination, Plaintiff also stated that he
"complained on a few occasions in person to Tom Wilson and Jerry Harty[,]" but provided no
additional details regarding these complaints. (D.I. 41, ex. I at 5; *see also* D.I. 1 at 21 (alleging
that "Plaintiff also complained to his management directly about treatment he believed was
discriminatory based on his race and sex"))

them about it. (D.I. 41, ex. A at 144-45, 165, 339-40) Mr. Fallon submitted a Declaration stating

that he had no knowledge of Plaintiff's January 11 call at the time of the termination decision.

(*Id.*, ex. B at ¶ 14) Mr. Wilson and Mr. Burgos submitted Declarations stating more broadly that

they were not made aware of any alleged complaint of race or gender discrimination made by

Plaintiff any time prior to Plaintiff's termination. (*Id.*, ex. E at ¶ 10; *id.*, ex. F at ¶ 2)

### B. Procedural History

On December 7, 2011, Plaintiff filed his Complaint. (D.I. 1) On March 27, 2012, Judge

Richard G. Andrews referred the case to the Court to resolve all pretrial matters, up to and

including the resolution of case-dispositive motions.

On June 14, 2013, Defendant filed the instant Motion. (D.I. 39) Plaintiff, now

proceeding *pro se*, did not file a response. (D.I. 45, 46)[5]

## II. STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a

genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 585 n.10 (1986). If the moving party has demonstrated the absence of a genuine

dispute of material fact, the nonmovant must then "come forward with specific facts showing

that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). If the

nonmoving party fails to make a sufficient showing on an essential element of its case with

---

[5]      The Court must therefore evaluate the merits of Defendant's motion in light of the
pleadings and record before it to determine whether summary judgment is appropriate.
*Pennewell v. Grant*, C.A. No. 09-cv-21 (GMS), 2012 WL 394928, at *2 (D. Del. Feb. 7, 2012).

respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III. DISCUSSION

### A. Plaintiff's Gender and Race Discrimination Claims

Title VII provides, in pertinent part, that it shall be unlawful for an employer to

"discharge any individual . . . because of such individual's race [or] sex [.]" 42 U.S.C. § 2000e-

2(a)(1). In the absence of direct evidence of discrimination, a plaintiff may prove gender and

race discrimination through the familiar burden-shifting analysis developed by the United States

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Taggart v.*

*Verizon Delaware LLC*, Civil Action No. 10-669-RGA, 2013 WL 456406, at *7-8 (D. Del. Feb.

1, 2013) (gender discrimination claim); *Hooten v. Greggo and Ferrara Co.*, Civ. No. 10-776-

RGA, 2012 WL 4718648, at *3 (D. Del. Oct. 3, 2012) (racial discrimination claim). Under

*McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by a

preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253

(1981); *Mercado v. Donahoe*, 487 F. App'x 15, 17 (3d Cir. 2012). If the plaintiff successfully

establishes his *prima facie* case, the burden shifts to the defendant employer to proffer a

legitimate, non-discriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at

142; *Taggart*, 2013 WL 456406, at *7; *Hooten*, 2012 WL 4718648, at *3. If defendant employer

can provide such a reason, the burden shifts back to plaintiff to demonstrate, by a preponderance

of the evidence, that the reasons offered by defendant were not its true reasons for the adverse

employment action, but were instead a pretext for discrimination. *Jones v. Sch. Dist. of Phila.*,

198 F.3d 403, 410 (3d Cir. 1999); *Taggart*, 2013 WL 456406, at *7; *Hooten*, 2012 WL 4718648,

11

at *3.[6]

### 1.    Gender Discrimination Claim—*Prima Facie* Case

To establish a *prima facie* case of "reverse" gender discrimination, a plaintiff must

ultimately show that:  (1) he was qualified for the position in question; (2) he suffered an adverse

employment action; and (3) the evidence is adequate to create an inference that the adverse

employment action was based on a trait protected by Title VII. *Degidio v. Centro Props., LLC*,

Civil Action No. 11-1353, 2013 WL 440131, at *3 (E.D. Pa. Feb. 4, 2013).

Defendant asserts that the only evidence Plaintiff could put forward to try to satisfy the

third element is his claim that Ms. Maher, an allegedly similarly situated female Verizon

employee, was treated more favorably than he. *See Robinson v. PFPC, Inc.*, Civil Action No.

08-5113, 2010 WL 744191, at *5 (E.D. Pa. Mar. 4, 2010) (noting that evidence that defendant

treated similarly situated female employee differently than plaintiff in reverse gender

discrimination case could suffice to satisfy this element).  The Court has thoroughly reviewed the

record and is aware of no other record evidence sufficient to even arguably satisfy this prong, and

Plaintiff (who did not file a response to Defendant's Motion) has put forward none.

The Third Circuit has explained that "similarly situated" employees need not be

"identically situated" in order to be considered valid comparators, but that they must nevertheless

be similar in "all relevant respects." *Wilcher v. Postmaster General*, 441 F. App'x 879, 882 (3d

Cir. 2011); *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (internal

---

[6]     Plaintiff also brings a claim of racial discrimination under Section 1981, but the
elements of that claim are the same as Plaintiff's Title VII racial discrimination claim, and so the
Court will analyze both under the framework referenced above. *See Haskins v. Christiana Care
Health Servs.*, 701 F. Supp. 2d 623, 627 (D. Del. 2010)

quotation marks and citation omitted). While the factors relevant to this analysis depend on the

context of each case, often a showing that a person is similarly situated "includes [evidence that]

the two employees dealt with the same supervisor, were subject to the same standards, and had

engaged in similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 F. App'x at 223

(internal quotation marks and citations omitted); *see also Wilcher*, 441 F. App'x at 882. Here,

the Court agrees with Defendant that there are multiple factors demonstrating that Plaintiff was

not similar to Ms. Maher, the suggested comparator, in "all relevant respects."

The first is the scope of the relevant disciplinary history involved. The record evidence

indicates that prior to her suspension for an unauthorized visit to the DRC, Ms. Maher had been

involved in less than five prior disciplinary incidents, none of which related to confrontation or

harassment of a fellow employee. (D.I. 41, ex. B at ¶ 21) In contrast, in just the last 10 years of

his employment, Plaintiff had been the subject of 21 separate disciplinary incidents. (*Id.*, ex. A at

ex. 10-17, 20-24, 26-28; *id.*, ex. C at ¶¶ 6-7 & exs. 1-2) One of those was a violation of

Verizon's Code of Conduct pertaining to discrimination, harassment and workplace violence, for

which Plaintiff received a 15-day suspension. (*Id.*, ex. A at ex. 16; *id.*, ex. C at ex 2 at

VEROOO556-57)[7] The significant differences between Plaintiff's lengthy disciplinary history

and that of Ms. Maher is a strong reason why Ms. Maher is not an appropriate comparator. *Cf.*

*Briggs v. Pa. Dep't of Transp.*, No. 02: 07-cv-0118, 2009 WL 2475455, at *8 (W.D. Pa. Aug. 7,

2009) (finding that where plaintiff had extensive disciplinary record, including nine suspensions,

---

[7]     Thus, for example, unlike in Ms. Maher's case, Plaintiff's argument with a
Verizon employee at the DRC, (*id.*, ex. A at ex. 19), demonstrated what could be viewed as part
of a pattern of argumentative or aggressive conduct at the workplace.

while purported comparators had received only counseling for their infractions and had no prior disciplinary action taken against them, plaintiff's record was a differentiating circumstance that prevented the comparators from being similarly situated).

The second factor relates to the number of violations giving rise to the disciplinary decision. While Ms. Maher was suspended for an unauthorized interaction and argument at the DRC, Plaintiff was terminated for multiple, separate violations occurring on the same day—relating to his conduct at the DRC, to the non-compliance with Work Rules and to the falsification of his time sheet. The difference in the number of violations at issue could also understandably beget a difference in treatment.

The Court therefore agrees with Defendant that under these circumstances, no reasonable jury could find Ms. Maher to be similarly situated to Plaintiff. *See Maull v. Div. of State Police, Dep't Of Pub. Safety, State of Del.*, 141 F. Supp. 2d 463, 479 (D. Del. 2001) (finding that circumstances of each proposed comparator were not sufficiently similar to plaintiff's circumstances, where there were meaningful differences in the circumstances of plaintiff's alleged misconduct as compared to that of comparators, and where none of the comparators had disciplinary records similar in length or scope to plaintiff's disciplinary record), *aff'd* 39 F. App'x 769 (3d Cir. 2002). Thus, Plaintiff cannot establish the third element of the *prima facie* case.

## 2.   Racial Discrimination Claim—*Prima Facie* Case

To establish a *prima facie* case of racial discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered some form of adverse employment action; and (4) this action occurred under circumstances that give rise to

14

an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *Hooten*, 2012 WL 4718648, at *3 (citing *Jones*, 198 F.3d at 410). Defendant asserts that the only record evidence Plaintiff could point to is the record regarding Ms. Maher and Mr. Andert—two Caucasian employees whom Plaintiff has asserted were similarly situated to him. Again, the Court is aware of no other evidence of record sufficient to even arguably satisfy this prong, and Plaintiff has put forward none.

The Court has already explained why no reasonable jury could find Ms. Maher to be a proper comparator. In light of the differences in their disciplinary records, and in the different number of violations giving rise to their respective disciplinary decisions, the Court comes to the same conclusion as to Mr. Andert. Indeed, as to the respective disciplinary records, the evidence is even more dissimilar with regard to Mr. Andert, who had only one prior minor incident of discipline at the time of his suspension.

### 3. Gender and Racial Discrimination Claims—Legitimate, Non-discriminatory Reason and Pretext

Even assuming *arguendo* that Plaintiff could make out a *prima facie* case of discriminatory discharge, his discrimination claims would nonetheless fail on this record.

Defendant has put forward legitimate, non-discriminatory reasons for its conduct. This "relatively light burden" is satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the

15

plaintiff." *Id.* (emphasis in original).

Here, Defendant points to multiple reasons why it discharged Plaintiff, including: (1) Plaintiff violated Work Rules and the Code of Conduct by failing to immediately notify a supervisor about a "roadblock" with the A Street job, by failing to attempt customer contact regarding the Lombard Street job, and by falsifying his time sheet for January 11, 2010; and (2) Plaintiff had (including the instant violations) a lengthy, documented history of performance and disciplinary issues.[8] (D.I. 40 at 19)  Courts have recognized these very reasons (violations of an employer's work rules and an extensive disciplinary history) each as legitimate, non-discriminatory reasons why an employee may be fired. *See, e.g., Lewis v. Bell Atlantic/Verizon*, 321 F. App'x 217, 221 (3d Cir. 2009) (concluding that plaintiff's attempt to submit a false time sheet constituted a legitimate, non-discriminatory reason for his termination); *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 979-81 (3d Cir. 1998) (same, as to plaintiff's violations of management policies); *DiSantis v. Morgan Props. Payroll Servs., Inc.*, Civil Action No. 09-6153, 2010 WL 3606267, at *8 (E.D. Pa. Sept. 16, 2010) (same, as to plaintiff's extensive disciplinary record); *Farrell v. Abbott Labs., Inc.*, No. 11 CV 00120, 2011 WL 4055167, at *8 (W.D. Pa. Sept. 12, 2011) (same, as to plaintiff's repeated violations of company policies).

Plaintiff would thus carry the burden of proving that these reasons were a pretext for discrimination. *Taggart*, 2013 WL 456406, at *7.  In order to show pretext in discrimination

---

[8]        Defendant also asserts that it discharged Plaintiff because he disregarded management instructions by visiting the DRC on January 11.  (D.I. 40 at 19)  The record evidence, however, is less than clear on exactly what the nature of those instructions were, and under exactly what circumstances they would have been violated.  For these reasons, the Court focuses more prominently here on the other reasons provided by Defendant for terminating Plaintiff's employment.

cases, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Here, Plaintiff has not attempted to rebut Defendant's legitimate, non-discriminatory reasons for his firing, nor could he, in light of the evidence of record. The record reflects that Defendant terminated Plaintiff after Plaintiff engaged in numerous violations of company policy occurring on January 11, 2010, including one involving dishonesty.[9] The cumulative impact of Plaintiff's overall employment record was also a listed reason for the firing—and it is undisputed that this record included a long list of over 20 disciplinary infractions, as well as year after year of negative performance evaluations that were at or near the lowest level that Plaintiff could possibly receive. There is no evidence that there were any references (either direct or indirect) by the decision makers regarding Plaintiff's race or gender prior to the decision to terminate his employment. And, as noted above, there is no evidence that employees similarly situated to Plaintiff were treated more favorably than he was.

The Court, therefore, finds that no reasonable jury could conclude that Defendant's reasons for Plaintiff's termination were a pretext for discrimination. *See Kuzma v. MBNA*

---

[9]     It is not clear that Plaintiff does (or could) deny that he engaged in at least certain of the conduct that led to his termination (i.e., that he falsified his time sheet). But even if Plaintiff did make such a denial, it would be insufficient to create a genuine issue of material fact, so long as (as here) the evidence indicated that the employer had a good faith belief that the conduct had occurred. *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703-04 (3d Cir. 2010). Nor could Plaintiff create such an issue of fact by simply putting forward his own personal belief that unlawful discrimination had occurred. *Id.*; *see also Javornick v. United Parcel Serv., Inc.*, Civil Action No. 07-0195, 2008 WL 4462280, at *3 (W.D. Pa. Sept. 29, 2008).

*Institutional PA Servs., LLC*, No. 2:10cv1433, 2013 WL 808837, at *7-8 (W.D. Pa. Mar. 5, 2013) (finding, in evaluating summary judgment motion, that there was insufficient evidence of pretext, for similar reasons as here).

## B. Plaintiff's Retaliation Claim

Title VII prohibits employers from retaliating against employees who have "made a charge . . . or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *See* 42 U.S.C. § 2000e-3(a). Claims of retaliation under Title VII are analyzed under the previously referenced burden-shifting test set out in *McDonnell Douglas*. *Jacques-Scott v. Sears Holding Corp.*, C.A. No. 10-422-LPS/MPT, 2013 WL 2897427, at *9 (D. Del. June 13, 2013).[10]

In order to establish a *prima facie* case of retaliation, a plaintiff must establish by a preponderance of the evidence that: "(1) [he] engaged in a protected activity under Title VII; (2) the employer took an adverse action against [him]; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008); *see also Jacques-Scott*, 2013 WL 2897427, at *9. Here, Plaintiff has not set forth a *prima facie* case of retaliation because he cannot adequately show that he engaged in a protected activity, or that there is a causal connection between the protected activity alleged and the adverse employment action.

"Under Title VII, a protected activity is when an employee opposes an unlawful gender

---

[10]     In addition to his Title VII claim of retaliation, Plaintiff also brings a retaliation claim under Section 1981. The elements of a claim of retaliation under Section 1981 are generally identical to the elements of a discrimination claim under Title VII, and so the Court will analyze Plaintiff's retaliation claim under the Title VII standards. *Daughtry v. Family Dollar Stores, Inc.*, 819 F. Supp. 2d 393, 403 (D. Del. 2011).

discrimination practice under Title VII or the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under 42 U.S.C. § 2000e-3(a)." *Jacques-Scott*, 2013 WL 2897427, at *9 (internal quotation marks, brackets and citations omitted). General complaints about unfair treatment without some more specific complaint of prohibited discrimination do not constitute the requisite protected conduct for a *prima facie* case of retaliation. *See Sanchez v. Sungard Availability Servs. LP*, 362 F. App'x 283, 287-88 (3d Cir. 2010) (finding that plaintiff's comments to co-workers that he was being "discriminated against, harassed and bullied" were too vague to constitute protected activity as to retaliation claim regarding national origin); *Perry v. Harvey*, 332 F. App'x 728, 732-33 (3d Cir. 2009) (finding that plaintiff's response to survey, which made only oblique reference to racial discrimination, one unconnected to the racially discriminatory conduct complained of, did not constitute protected activity); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d. Cir. 1995) (finding that plaintiff's letter complaining about "unfair treatment in general" and dissatisfaction over not being awarded a position was insufficient to constitute protected activity in age discrimination case).

Plaintiff's retaliation claim appears to be predominantly, if not exclusively, based on his January 11, 2010 call to Verizon's Global Compliance hotline, (D.I. 1 at 3; D.I. 41, ex. A at 146-50, 182-85, 187 & ex. 2), but his complaints in that call are too equivocal and vague to constitute protected activity. Plaintiff acknowledged (and the evidence of record indicates) that he did not make any reference to racial or gender discrimination on the call; instead, he complained about the allegedly "hostile" and "unprofessional" behavior of Ms. Cersari and Mr. Williams, which had caused a "hostile work environment." (D.I. 41, ex. A at 146-50, 182-85, 187 & ex. 2) Even

19

viewing the evidence in the light most favorable to Plaintiff, in the context of this case,

Plaintiff's general complaint about the "disrespectful" way in which two co-workers (a white

female and an African-American male) interacted with him, (D.I. 41, ex. A at ex. 2), is not

sufficient to constitute protected activity under Title VII. *See Sanchez*, 362 F. App'x at 287-88;

*Perry*, 332 F. App'x at 732-33; *Barber*, 68 F.3d at 701-02.

      Furthermore, even if Plaintiff's January 11 call did constitute protected activity, Plaintiff

has not shown a causal connection between these complaints and Plaintiff's termination.

Plaintiff acknowledged that he has no facts demonstrating that Mr. Fallon or Mr. Wilson had

knowledge of the January 11 call prior to his termination. (D.I. 41, ex. A at 144-45, 165, 339-40)

And the three supervisors involved in the decision to terminate Plaintiff's employment—Mr.

Fallon, Mr. Wilson and Mr. Burgos—have all submitted Declarations stating either that they

had no knowledge of the January 11 call (or, more broadly, no knowledge of any claim by

Plaintiff of racial or gender discrimination) at the time of the termination decision. (*Id.*, ex. B at

¶ 14; *id.*, ex. E at ¶ 10; *id.*, ex. F at ¶ 2; *id.*, ex. G at 5-6) Without showing that the supervisors

who made the decision to terminate his employment had knowledge of the January 11 call to

Verizon's Global Compliance hotline, Plaintiff cannot show a causal connection between the

protected activity alleged and the adverse employment action. *See Sanchez*, 362 F. App'x at 288

(affirming grant of summary judgment on alternative ground that employee failed to establish a

causal connection between his termination and his alleged reporting of discrimination, in that the

individuals responsible for deciding to discharge him were unaware of the complaint); *Shahin v.*

*Delaware*, Civ. No. 10-956-LPS, 2013 WL 5273297, at *7 (D. Del. Sept. 18, 2013) (concluding

that no nexus existed between the prospective employee's filing of a charge of discrimination

and the employer's hiring decision because there was no evidence that employer had knowledge of that filing).[11]

For each of these reasons, Plaintiff cannot make out a *prima facie* case of retaliation, and his claim must therefore fail.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Defendant's Motion for Summary Judgment be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1) and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

---

[11]     As noted above, in response to an interrogatory requesting information regarding all individuals with whom Plaintiff communicated about alleged discrimination, Plaintiff stated that he "complained on a few occasions in person to Tom Wilson and Jerry Harty[,]" but provided no additional details regarding these complaints. (D.I. 41, ex. I at 5; *see also* D.I. 1 at 21 (alleging that "Plaintiff also complained to his management directly about treatment he believed was discriminatory based on his race and sex")) With such little information in the record regarding these alleged complaints, the Court cannot conclude that they are sufficiently specific to constitute protected activity under Title VII. Even assuming *arguendo* that these complaints did constitute protected activity, Plaintiff has put forward no record evidence showing a causal connection between these complaints and Plaintiff's termination, and the Court is aware of none. Indeed, the available record evidence indicates just the opposite. Mr. Wilson's Declaration states that he was not "made aware of any alleged complaint of race or gender discrimination made by Plaintiff" any time prior to Plaintiff's termination, and Mr. Harty was not involved in the decision to terminate Plaintiff's employment. (D.I. 41, ex. E at ¶ 10; *id.*, ex. G at 5-6)

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

Dated: January 31, 2014

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE